IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

## STATE OF TENNESSEE v. BLAZE VALENTINO BURKETT

**Appeal from the Circuit Court for Wayne County**
**No. 16191      J. Russell Parkes, Judge**

_____

### No. M2019-02143-CCA-R3-CD

_____

The Defendant, Blaze Valentino Burkett, appeals as of right from the Wayne County Circuit Court's revocation of his probation and his being ordered to serve the remainder of his ten-year sentence for possession of 0.5 grams or more of methamphetamine with the intent to sell. The Defendant contends that the trial court abused its discretion by fully revoking his probationary sentence and that an alternative to full incarceration should have been imposed to allow him to seek treatment for his methamphetamine addiction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brandon E. White, Columbia, Tennessee (on appeal), and Travis B. Jones, District Public Defender, and Robert H. Stovall, Jr., Assistant District Public Defender (at revocation hearing), for the appellant, Blaze Valentino Burkett.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Patrick Butler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

On July 31, 2017, a Wayne County grand jury indicted the Defendant for two counts of possession of 0.5 grams or more of methamphetamine with the intent to sell, unlawful possession of drug paraphernalia, and resisting arrest. See Tenn. Code Ann. §§ 39-16-602, -17-417, -17-425, -17-434. He, thereafter, on January 14, 2019, pled guilty to one count of possession of 0.5 grams or more of methamphetamine, a Class B felony, with a ten-year

sentence to be suspended after service of one year in confinement, a $2,000 fine, and court costs; the remaining charges were dismissed.

The Defendant, who had been in custody from March 13, 2017, to January 14, 2019, was released following his guilty plea. Following his release in January 2019, he reported to his probation officer, Bethany Sisseck. According to Ms. Sisseck, the rules of probation were explained to the Defendant at the initial intake visit, and the Defendant was provided with an opportunity to ask any questions. The Defendant was also given a drug test at that time, and he was negative for "all substances." Ms. Sisseck stated that the Defendant complied with the rules of his supervision until May 2019, when he incurred new charges. Prior to that time, the Defendant reported as instructed, passed his drug screens, provided verification of employment, and was compliant when home visits were performed.

On May 7, 2019, the Defendant was arrested in Henderson County for two counts of aggravated assault, two counts of assault against a police officer, aggravated burglary, possession of methamphetamine with the intent to sell, and introduction of contraband into a penal facility. Thereafter, on May 14, 2019, Ms. Sisseck filed a probation violation report against the Defendant based upon the new criminal charges, as well as the Defendant's leaving his county of residence without permission. Ms. Sisseck's violation report indicated that the Defendant struck two officers with a tire iron during the confrontation. The trial court issued a warrant that same day.

The warrant was amended on June 3, 2019, to add an additional violation based upon the Defendant's being arrested on May 28, 2019, for escaping from custody. The allegation involved the Defendant's escape from the holding area beside the courtroom at the Henderson County Criminal Justice Complex.

At a probation violation hearing held on November 14, 2019, Ms. Sisseck testified about the Defendant's probation supervision history, which began on January 14, 2019; their last meeting occurring on April 18, 2019. Ms. Sisseck stated that while she supervised the Defendant, he reported as instructed, provided employment verification from a local body shop, and complied with home visits. According to Ms. Sisseck, the Defendant was also administered several drug tests during this time, all of which produced negative results. Ms. Sisseck agreed that the Defendant made regular $100 payments towards his court costs. Ms. Sisseck stated that she did not have any issues with the Defendant until his arrest on the new charges and agreed that he was "an exceptional probationer" prior to that time.

Ms. Sisseck confirmed that she filed a probation violation warrant against the Defendant because of the charges he incurred in Henderson County on May 7, 2019. She further confirmed that she later amended the warrant to include the escape charge.

Henderson County Sheriff's Deputy Jason McCallister testified regarding the events leading to the May 7, 2019 charges against the Defendant. Deputy McCallister testified that around 2:44 p.m. that day, he was on routine patrol when he was dispatched to a house belonging to Tim Burkett, the Defendant's father. According to Deputy McCallister, the Defendant's father had requested police assistance because the Defendant, who was not supposed to be present, was at the house trying to get inside. The dispatcher informed Deputy McCallister that deputies had gone to the same house the night before, but when the deputies arrived, the Defendant, who appeared to be armed, ran into the woods.

Upon arriving at the Defendant's father's house, Deputy McCallister saw a male who matched the description that dispatch had given him, later identified as the Defendant. The Defendant "was going around the end of the house on the carport end" and had an object in his hand, though Deputy McCallister could not identify the object at that time. Deputy McCallister exited his vehicle, followed the Defendant around the carport end of the residence, and heard a "loud pop" that he initially believed was a gunshot. Deputy McCallister retrieved his service weapon from his holster before peering around the corner to see the Defendant holding a tire iron. After seeing what was taking place, Deputy McCallister realized that what he thought was a gunshot was in fact the Defendant's striking the second panel of a sliding door trying to break the glass and that the Defendant had already broken the first panel.

Deputy McCallister, "probably" with his service weapon in "a low ready position," yelled at the Defendant and asked him what he was doing. The Defendant then left the back-porch area and walked towards Deputy McCallister while using expletives and threatening to "whoop [Deputy McCallister's] a-s" and beat him with the tire iron. According to Deputy McCallister, the Defendant wielded the tire iron up and down in a striking or throwing motion, and the Defendant was acting erratically. Deputy McCallister took a few steps back from the Defendant in order to create a gap so that he could talk to the Defendant until backup arrived. Deputy McCallister told the Defendant, who was about twenty to twenty-five feet away, to put the tire iron down, but the Defendant refused. Deputy McCallister testified that he was afraid that the Defendant would assault him with the tire iron and that if the Defendant had thrown the tire iron from that distance, it could have hit Deputy McCallister in the head.

During the initial foray, the Defendant said to Deputy McCallister that he "had better be glad [the Defendant] didn't get in the house and get his gun, because [the Defendant] was wanting to have a shootout with" police. The Defendant was also yelling at his father, who was inside the house. The Defendant said to his father that the police were going to have to kill him because he was not going back to jail.

Possibly a minute and one-half to two minutes after Deputy McCallister's arrival, a backup unit arrived, causing the Defendant to throw the tire iron out into the yard, and he

said that he did not need it because he could "whoop [the officers'] a-s[es] without it." When Sergeant Mark Wood came around the corner, Deputy McCallister told the Defendant that he was under arrest and ordered him to put his hands behind his back. Though the Defendant put his hands behind his back "for a split second," the Defendant only did so to lure the officers closer, in Deputy McCallister's opinion. When the Defendant took "another fighting stance," Deputy McCallister sprayed the Defendant with a chemical spray in the face and eyes. According to Deputy McCallister, the chemical spray initially had little to no effect on the Defendant, and therefore, Deputy McCallister had to strike the erratic Defendant with his baton on the outside of the Defendant's shin between his hip and his knee. The Defendant still did not go down to the ground, which was abnormal in Deputy McCallister's experience. As Deputy McCallister approached the Defendant to place handcuffs on him, the Defendant started swinging and elbowed Deputy McCallister in the right side of his head and face. Deputy McCallister also saw the Defendant hit Sergeant Wood.

Though the Defendant broke free from the initial scuffle, the chemical spray started to have an impact, making the Defendant unable to see where he was going. Ultimately, Deputy McCallister and Sergeant Wood were able to regain control of the situation and get the Defendant to the ground, where they handcuffed him. Deputy McCallister charged the Defendant with "domestic assault on his father, aggravated domestic on his father, aggravated burglary for breaking into the house to commit a felony theft or assault," aggravated assault of Deputy McCallister based upon the Defendant's use of the tire iron, and simple assault of Sergeant Wood. Though both officers were sore from their altercation with the Defendant, neither suffered any serious injuries.

After being handcuffed, the Defendant told Deputy McCallister that he did not care what they did to him and that he had been taking methamphetamine and had been up for five days. Deputy McCallister testified that when the Defendant was later booked into the jail, officers found eight to nine grams of methamphetamine on his person. Though Deputy McCallister was not present for booking, Deputy McCallister stated that the general practice was to give a defendant an opportunity to turn over any drugs on his person before being booked. According to Deputy McCallister, the Defendant admitted to the officers at the jail that the substance they found was methamphetamine. As a result, the Defendant was charged with introduction of drugs into a penal facility.

Henderson County Sheriff's Investigator Danny Crownover testified that on May 28, 2019, he was in the Henderson County General Sessions Court on an unrelated matter. Investigator Crownover explained that he was standing against the courtroom wall after the Defendant "had already had his court proceedings." When Investigator Crownover observed the Defendant that day, the Defendant, who was in custody, suddenly bolted out of the holding area after someone left the door unlocked. The Defendant's restraints had

already been removed at that time because the jailers were preparing to take the Defendant "back to his pod." According to Investigator Crownover, the Defendant "hopped over a rail[,] . . . made his way down the aisle[,] and went out the back door and out through the lobby." Three or four officers, including Investigator Crownover, chased after the Defendant, and the Defendant was ultimately detained just outside the exterior door of the Henderson County Criminal Justice Complex. Based on the Defendant's actions, he was charged with escape.

The Defendant, twenty-four years old at the time of the hearing, testified that he had been doing well on probation when "all of a sudden one day things just seemed to go bad." The Defendant, who claimed he suffered from Post-Traumatic Stress Disorder, said that he "just lost [his] mind" because he was scared.

The Defendant stated his belief that people whom he did not know, sometimes five or six cars and ten to twelve people at a time, had been following him during the last month he was on probation and were trying to kill him. The Defendant said that based upon this belief, he went to see his father the night before May 7, 2019, so he could ask to borrow a firearm; however, the Defendant's father was afraid of the Defendant and called the police on that occasion.

Relative to the incident that occurred the next day involving Deputy McCallister, the Defendant explained that he was trying to break into his father's house because his father did not answer the door and would not come outside, so he was worried. The Defendant admitted that he had a tire iron and displayed it an "offensive manner" towards Deputy McCallister, but asserted that he put the tire iron down at Deputy McCallister's request. The Defendant explained that he had been in jail his whole life and did not want to go back, so when Deputy McCallister arrived, he tried to provoke Deputy McCallister into shooting him by calling Deputy McCallister names and threatening to "[w]hip [his] a-s." The Defendant acknowledged that he called Deputy McCallister "bad names" in an effort to get him to shoot. In addition, the Defendant said that he only hit Sergeant Woods after Sergeant Woods first struck him with a baton. The Defendant averred that he had a right to defend himself, which was what he was trying to do, and that the officers who came there just did not understand the situation, though the Defendant did not disobey the officers' commands. The Defendant denied that he had ever been prescribed any psychiatric medication and further denied that he had ever taken any such medication.

On cross-examination, the Defendant refused to admit that the officers found methamphetamine on his person when they booked him into the jail or that he admitted to the booking officers that it was methamphetamine, though the Defendant acknowledged that he had started using methamphetamine again by that time. The Defendant indicated that he had started "eating" methamphetamine because he was afraid to go to sleep. Relative to the escape charge, the Defendant admitted that he escaped from the holding

area, jumped the rail, and ran from the courtroom thorough the lobby to the outside before being captured in front of the building.

Following the conclusion of the proof, the trial court fully revoked the Defendant's probation. The trial court acknowledged that the Defendant appeared to initially do well on probation, though noting that the Defendant had only served about four months of his supervised release. With respect to the allegations in the first violation warrant, the trial court found that the State had met its burden of proving by a preponderance of the evidence that the Defendant committed two counts of aggravated assault, two counts of assault on an officer, aggravated burglary, possession of methamphetamine with the intent to sell, and introduction of contraband into a penal institution. The trial court determined that the State had failed to prove that the Defendant struck the two officers with a tire iron, as stated in the probation violation warrant. Relative to the amended warrant, the trial court concluded that the State had likewise established by a preponderance of the evidence that the Defendant was in lawful custody when he escaped from the holding area inside the courtroom at the Henderson County Criminal Justice Complex. In addition, the trial court found that Deputy McCallister, Investigator Crownover, and Ms. Sisseck were credible in all respects and that any testimony offered by the Defendant to the contrary was resolved against the Defendant.

The trial court found that the Defendant had violated the conditions of his probation and that after "considering all sanctions available to the [c]ourt including [the] potential split confinement and/or reinstatement of probation," none were appropriate in this case. Accordingly, the Defendant was ordered to serve the balance of his ten-year sentence in confinement. The Defendant filed a timely notice of appeal.

## ANALYSIS

The Defendant contends that the trial court abused its discretion by fully revoking his probationary sentence and that instead, the trial court should have imposed an alternative to full revocation, such as split confinement, with the condition that the Defendant complete an inpatient substance abuse rehabilitation program upon his release from custody. The Defendant notes Ms. Sisseck's testimony that he initially did well on probation before he started using methamphetamine again. He asserts that he suffered "from methamphetamine-induced delusions when he encountered Deputy McCallister and that he was still suffering from the horrible effects of methamphetamine use leading up to the probation revocation hearing based on his delusional belief that people were still following him." Accordingly, he concludes that an alternative to full revocation should have been imposed to allow him "to be rehabilitated from his severe addiction to methamphetamine."

- 6 -

The State responds that the trial court properly exercised its discretion by ordering the Defendant to serve the balance of his sentence in confinement after finding that the Defendant violated his probation by incurring new criminal charges. The State further avers that the Defendant's admissions at the probation revocation hearing that he was using methamphetamine again and had escaped from lawful custody were sufficient to justify the revocation.

A trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release. Tenn. Code Ann. § 40-35-311(e). If the trial court revokes the probation, it has the right to "extend the defendant's period of probation supervision for any period not in excess of two (2) years," "commence the execution of the judgment as originally entered," or "[r]esentence the defendant for the remainder of the unexpired term to any community-based alternative to incarceration." Tenn. Code Ann. §§ 40-35-308(c), -35-311(e). In a probation revocation hearing, the credibility of the witnesses is determined by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991).

Furthermore, the decision to revoke probation is in the sound discretion of the trial judge. State v. Kendrick, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005); Mitchell, 810 S.W.2d at 735. The judgment of the trial court to revoke probation will be upheld on appeal unless there has been an abuse of discretion. State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). To find an abuse of discretion in a probation revocation case, "it must be established that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." Id. (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)); see also State v. Farrar, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011). Such a finding "reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

The trial court found that the Defendant violated his probation by incurring new charges and that the State had established such violation by a preponderance of the evidence. In order to establish a violation of a suspended sentence based on the commission of a new offense, the State must offer proof by a preponderance of the evidence showing that a defendant violated the law. See State v. Catherin Vaughn, No. M2009-01166-CCA-R3-CD, 2010 WL 2432008, at *3 (Tenn. Crim. App. June 14, 2010) (noting that proof of a conviction is not necessary). However, the State "must present sufficient facts at the revocation hearing to enable the trial court to 'make a conscientious and intelligent judgment as to whether the conduct in question violated the law.'" State v. Jason

L. Holley, No. M2003-01429-CCA-R3-CD, 2005 WL 2874659, at *4 (Tenn. Crim. App. Oct. 25, 2005) (quoting Harkins, 811 S.W.2d at 83 n.3).

Here, Ms. Sisseck testified that the rules of probation were explained to the Defendant at his initial intake visit, which included not violating the law. Deputy McCallister testified regarding the events that took place on May 7, 2019, leading to the new charges against the Defendant of two counts of aggravated assault, two counts of assault against a police officer, aggravated burglary, possession of methamphetamine with the intent to sell, and introduction of contraband into a penal facility. Investigator Crownover testified about the events leading to the escape charge. The trial court found their testimony credible. This court has previously concluded that "a police officer's testimony about the facts surrounding the arrest used as the basis for the violation 'constituted substantial evidence' and was 'sufficient to support the trial court's [revocation of a suspended sentence].'" State v. Jeremy Bo Eaker, No. M2013-01639-CCA-R3-CD, 2014 WL 546348, at *5 (Tenn. Crim. App. Feb. 11, 2014) (quoting State v. Chris Allen Dodson, M2005-01776-CCA-R3-CD, 2006 WL 1097497, at *3 (Tenn. Crim. App. Mar. 31, 2006)) (concluding that officer's testimony "was straight-forward: upon executing a traffic stop, he found [the defendant] in possession of drug paraphernalia and a white powder, which he stated, based upon his experience as a law enforcement officer and as a drug task force agent, appeared to be methamphetamine[,]" and provided a sufficient basis for revoking probation).

Moreover, the Defendant admitted to escaping from lawful custody. This alone is substantial evidence of record to support the trial court's revocation order. See State v. Michael Emler, No. 01C01-9512-CC-00424, 1996 WL 691018, at *4 (Tenn. Crim. App. Nov. 27, 1996) (holding that when the defendant admits violating the terms of probation, revocation by the trial court is not arbitrary or capricious).

Furthermore, this court has repeatedly held that "'an accused, already on [a suspended sentence], is not entitled to a second grant of probation or another form of alternative sentencing.'" State v. Dannie Brumfield, No. M2015-01940-CCA-R3-CD, 2016 WL 4251178, at *3 (Tenn. Crim. App. Aug. 10, 2016) (quoting State v. Jeffrey A. Warfield, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999)); see also State v. Timothy A. Johnson, No. M2001-01362-CCA-R3-CD, 2002 WL 242351, at *2 (Tenn. Crim. App. Feb. 11, 2002). Here, the Defendant admitted that he started "eating" methamphetamine within four months of his release. He proceeded to engage in erratic and violent behavior. Relative to any methamphetamine-induced hallucinations, the Defendant denied that he had ever been prescribed any psychiatric medication and further denied that he had ever taken any such medication. We cannot say that the trial court abused its discretion by concluding that the Defendant's drug issues would best be treated in a correctional facility rather than in the community.

The trial court determined that the Defendant violated the conditions of his probation by a preponderance of the evidence. Thereafter, it was within the trial court's authority to order the Defendant to serve the balance of his previously imposed ten-year sentence in confinement upon revoking the Defendant's probation. See Tenn. Code Ann. §§ 40-35-310, -311(e); see also Mitchell, 810 S.W.2d at 735.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_

_____
D. KELLY THOMAS, JR., JUDGE